UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | ) |
| v. | ) |
| | ) Docket no. 2:19-cr-00200-GZS |
| DONNA PAGNANI, | ) |
| | ) |
| | ) |
| Defendant. | ) |

**ORDER ON MOTION TO SUPPRESS**

Before the Court is Defendant Donna Pagnani's Motion to Suppress Evidence (ECF No. 70). After delays caused by the District of Maine's response to the COVID-19 pandemic, the Court held an in-person evidentiary hearing on April 27, 2021. Then, on May 20, 2021, the Court held oral argument via videoconference. Having considered the evidence and arguments before it, the Court DENIES the Motion for the reasons explained herein.

**I.     FACTUAL FINDINGS**

On May 31, 2019, Maine State Trooper Jesse Duda was patrolling the southern section of the Maine Turnpike, also known as I-95, in an unmarked vehicle with his K-9, Mac, who is trained in narcotics detection. At approximately 6:30 PM, Duda initiated a traffic stop of a black Cadillac on I-95 northbound near mile marker 15. Duda had clocked the Cadillac traveling at 68 M.P.H. in a construction zone with a posted 60 M.P.H. speed limit. Running the license plate, Duda learned that the Cadillac was registered to Deborah Gregorczuk, who had a suspended driver's license. Upon his initial interaction with the female driver, whom he presumed was the registered owner, he learned that the vehicle was being driven by Gregorczuk's daughter, Donna Pagnani. At Duda's

request, Pagnani provided a vehicle registration and Maine driver's license indicating that she lived in the Lewiston area. She told Duda that she was traveling back from shopping at a Marshall's store in New Hampshire, where she had purchased a pair of shoes and some clothing. Pagnani further explained that she had originally planned to shop in Kittery, Maine but had missed the exit and, thus, had unintentionally ended up in New Hampshire. She also informed Duda that her mother had brain cancer.

Upon returning to his cruiser, Duda radioed "709," the call signal for Trooper Jodelle Wilkinson, a female trooper who was also patrolling in southern Maine at that time. Wilkinson offered to come to the scene as a back-up officer. Duda accepted that offer while commenting, "not sure exactly what I got yet." (Gov't Ex. 2A at 3:30.) Duda then ran Pagnani's license and determined that she was subject to two separate sets of bail conditions, one in Maine and one in New Hampshire. He further confirmed that Pagnani's Maine bail conditions limited her ability to leave the State of Maine. Duda also received a call from another officer, Corporal Rick Cody, who explained that he was familiar with Pagnani and that she had previously been involved in drug trafficking.

Less than ten minutes after the initial stop, Duda again approached the passenger side of the Cadillac and confronted Pagnani about being subject to bail conditions. At that point, she admitted that she was on probation as well as bail. In response to Duda's question, Pagnani admitted that her probation was related to drug possession or trafficking. Duda then asked Pagnani to "hop out of the vehicle."[1] (Id. at 9:25.)

---

[1] Duda's request was motivated by safety concerns as well as a desire to better hear Pagnani. Having reviewed the various video exhibits of the stop, the Court notes that it is much easier to hear Pagnani's responses to Trooper Duda's questions after she exits the vehicle.

Now outside the vehicle, Pagnani denied having any drugs on her person. Duda asked additional questions about Pagnani's itinerary. Pagnani responded defensively and accused Duda of "badgering" her. (Id. at 10:28.) Duda then asked for the name of Pagnani's probation officer, which Pagnani provided. She also indicated that she had just seen her probation officer, Nicole Gagnon, earlier that day. Duda then returned to his cruiser to contact Gagnon leaving Pagnani standing in front of his vehicle. From inside this cruiser, Duda witnessed Pagnani tapping her watch and generally appearing impatient. In response, Duda explained to Pagnani that she was being detained while he waited to hear from her probation officer. (Id. at 12:44.)

Once he reached Gagnon by phone, Duda explained that Pagnani had not immediately disclosed that she was on probation and also relayed Pagnani's story of "leaving Maine by accident" and shopping in New Hampshire. (Id. at 13:29.) Gagnon expressed surprise at Pagnani's itinerary and indicated that Pagnani was supposed to be taking care of a warrant in Massachusetts. At that point, Duda saw Pagnani pull a cell phone from her shirt and begin to use the phone. He then paused his conversation with Gagnon, exited his vehicle, and placed Pagnani in handcuffs. When Pagnani asked why she was being placed in handcuffs, Duda explained she was being detained for "failing to notify me that you are on probation" as well as attempting to use her phone. (Id. at 14:19.) Duda then returned to his cruiser to speak further with Gagnon. However, Pagnani, now in handcuffs, approached the cruiser indicating a desire to talk to her probation officer. In response, Duda ordered her back to the front of his vehicle and told her "don't move or you are going to jail." (Id. at 14:42.)

Gagnon then informed Duda that Pagnani had just been released from jail after repeated drug usage and that they were attempting to get Pagnani into in-patient substance abuse treatment soon. Gagnon also informed Duda that Pagnani's mother had in fact passed away. Gagnon warned

Duda that Pagnani had a lengthy history of drug trafficking and being difficult with law enforcement. Duda indicated to Gagnon that he was planning to conduct a K-9 sniff of Pagnani's vehicle based on his suspicion that she was carrying drugs. Duda also confirmed that Pagnani was subject to the search conditions as part of her probation.

Approximately 15 minutes into the stop—while Duda was on the phone with Gagnon—Trooper Wilkinson arrived on the scene to find Pagnani already in handcuffs standing in front of Duda's cruiser. Pagnani explained to Wilkinson that Duda was talking to her probation officer and that she also wanted to speak with her. Upon Duda exiting his cruiser, he asked Wilkinson to conduct a pat down hand search of Pagnani. He also informed Pagnani that he was going to have his K-9 sniff search her vehicle.

Wilkinson then proceeded to complete her pat search of Pagnani in front of the Cadillac, during which she located empty plastic bags secreted in Pagnani's bra.[2] Meanwhile, Duda led Mac around Pagnani's vehicle. After being led around the vehicle, Mac's final response indicated that the strongest odor of narcotics appeared to emanate from inside the driver's side door. After putting Mack back in his cruiser, Duda conducted a hand search of the vehicle. He did not find any illegal drugs. He did locate an urn containing the cremated remains of Deborah Gregorczuk. While watching the search from her vantage in front of the Cadillac with Wilkinson, Pagnani became increasingly upset and expressed concern that Duda's search would damage the small urn of her mom's ashes. In addition to his search, Duda also had Mac sniff the inside of Pagnani's vehicle but Mac did not indicate on any portion of the Cadillac's interior.

Based on his training and experience, Duda at that point believed Mac may have detected the residual scent of narcotics that were now located on Pagnani's person. Duda then attempted

---

[2] When asked to explain why these bags were in her bra, Pagnani claimed to have a medical marijuana card and that she had planned to bring some marijuana with her in the bags.

to conduct a canine sniff of Pagnani individually.  While Mac did not indicate on Pagnani, based on Pagnani's reaction, including her stance and her effort to redirect the K-9 away from her groin area, Duda suspected that Pagnani might be secreting drugs inside her person.  After placing Mac back in the cruiser, Duda called Gagnon to report the results of his search as well as his increasing suspicion that Pagnani was in possession of narcotics.  Nonetheless, Duda acknowledged that he would only have a basis for arresting Pagnani if the probation officer indicated that she wished to place a "hold" on Pagnani.  (Gov't Ex. 1A at 41:32.)  At that point, Gagnon and Duda discussed a plan to arrest Pagnani and transport her to York County Jail.  Duda then called for a tow truck to come retrieve the Cadillac.  He also asked Wilkinson to do another search of the interior of the Cadillac.

Approximately fifty minutes into the traffic stop, Duda directed Pagnani—still in handcuffs—to "have a seat" in the front passenger seat of his cruiser and explained that she was going to jail for violating her bail conditions and because of a probation hold.  (Id. at 52:18-52:40.)  Duda then gave Pagnani the standard verbal Miranda warning seeking a verbal response from Pagnani that she understood each right.  (Id. at 53:35-55:05.)   When Duda specifically asked whether Pagnani understood her right to an attorney, Pagnani responded:  "Can I call my attorney please and speak with her?  I mean not my attorney." (Id. at 54:03.)   Duda pressed on with the remainder of the Miranda warning quickly reaching the final Miranda question, "Having those rights in mind that I have just explained to you, do you wish to answer any questions at this time?" (Id. at 54:21.)  Pagnani responded, "What you got for questions?"  (Id. at 54:22.)

An exchange then ensued between Duda and Pagnani as they sat inside the front of his cruiser.  Duda first advised Pagnani that she could be charged with a separate felony if she carried narcotics into the jail, but that she could avoid that felony charge, if she gave him any narcotics

that she might be hiding prior to her being transported to the jail.  Pagnani expressed a desire to talk to her probation officer in hopes of not going to jail and having her car impounded.  (See Gov't Ex. 3B at 00:11 ("Why can't we just call her?").)  She insisted that she was "clean and sober"  (Id. at 2:15.)  She also repeatedly asked Duda, "What do you want from me?  What can I do?"  (Id. at 3:23 & 4:44.)

Wilkerson joined in the discussion with Pagnani from the passenger side window, encouraging Pagnani to give up any narcotics she had on her person and indicating a willingness to "work" with Pagnani. (Id. at 6:36.)  Pagnani grew increasingly upset and stated that she wanted to "go home." (Id. at 7:07 & 7:32.)  She then said she would give the officers the drugs "right now."  (Id. at 8:00.)  She also expressed a desire to overdose on narcotics.  (Id. at 8:05.)  Duda then indicated that if Pagnani would give up the drugs, he would call her probation officer.  (Id. at 8:42 & 10:33.)  Pagnani then admitted that she was carrying approximately 50 grams heroin, likely laced with fentanyl, inside her vagina.[3]  (Id. at 9:50-9:57.)   Pagnani suggested that she could pull the narcotics herself.  The officers then offered to take Pagnani to a maintenance yard nearby, but Pagnani insisted that she could remove the drugs without going to another location.  Ultimately, the officers then set up a privacy screen between the two passenger doors of Pagnani's vehicle and Pagnani removed the package of drugs and placed it in an evidence bag.

Just as the officers were securing this contraband, the tow truck arrived for the Cadillac.  Pagnani expressed surprise and concern that her car was going to be towed and that she would not be driving the car home.  She also asked to smoke a cigarette, which the officers facilitated.  Duda then indicated they would call Gagnon from his vehicle, as previously promised.  Approximately seventy-three minutes after the stop began, Duda began transporting Pagnani to jail while calling

---

[3] She explained to the officers that this amount would last her five to six days given that she was consuming 4-5 grams a day.  Id. at 9:11-41.  She later indicated that this was a weekly trip.  Id. at 10:49.

Gagnon. Pagnani proceeded to have a five-minute conversation with Gagnon asking many questions about what would happen next and how long she would be in jail, as well as expressing her desire to get sober. Once off the phone with Gagnon, Pagnani passed the remainder of time in transport conversing with Duda, including inquiring who had set her up, lamenting how hard it was to get substance abuse treatment, as well as reciting a poem she had written about her addiction.

## II.     DISCUSSION

Defendant now asks the Court to suppress the evidence seized as well as the statements she made during the just-described traffic stop. The Court notes initially that the Government conceded at oral argument that it would not seek to introduce as part of its case-in-chief any statements made during the time period in which Pagnani was placed in handcuffs but not yet read her Miranda rights, a period totaling approximately forty minutes. Thus, with respect to Defendant's statements, the Court limits its consideration accordingly. As briefed and argued, Defendant's Motion to Suppress raises objections regarding the duration of the May 31st stop as well as objections related to Pagnani's waiver of Miranda rights. The Court first considers the stop.

### A.     The Initial Stop and Seizure

"Investigatory stops have two components: (1) a police officer must have a reasonable, articulable suspicion of an individual's involvement in some criminal activity in order to make the initial stop, . . . and (2) any action undertaken with respect to the stop must be reasonably related in scope to the stop itself unless the police have a basis for expanding their investigation." United States v. Dion, 859 F.3d 114, 124 (1st Cir. 2017) (cleaned up).

As to the first component, Trooper Duda instituted a routine traffic stop of Pagnani based on observed speeding and a suspicion that the vehicle was being operated by its registered owner, who had a suspended license. See United States v. Orth, 873 F.3d 349, 354 (1st Cir. 2017) ("An officer's actions must be justified at their inception . . . .")  The Court is readily satisfied that these dual bases justified the initial stop of Pagnani. See, e.g., Kansas v. Glover, 140 S. Ct. 1183, 1186 (2020) (holding an investigative traffic stop of a vehicle is reasonable when information indicates that the owner had license revoked and there is no information negating an inference that the owner is the driver). Upon stopping Pagnani, Trooper Duda then made reasonable initial inquiries as "an officer carrying out a routine traffic stop [is allowed] to request identification from the driver and to inquire into the driver's itinerary." Dion, 859 F.3d at 125.

As to the second component, the result of those initial inquiries quickly led to a shift in focus as Duda learned that Pagnani had apparently violated bail conditions that restricted her ability to travel to New Hampshire. Then, Duda reasonably and diligently increased the scope of his investigation after learning that Pagnani was on probation and had a history of drug use and drug trafficking. See Orth, 873 F.3d at 354 ("[C]ircumstances and unfolding events during a traffic stop allow for an officer to 'shift his focus and increase the scope of his investigation by degrees' with the accumulation of information.") (quoting United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001)). In short, the Court readily finds based on the totality of the circumstances that the extension of the stop and the expansion of the investigation into Pagnani's travel story was supported by reasonable suspicion. In reaching this conclusion, the Court accords due weight to the fact that Pagnani was subject to search conditions as a result of her probation.[4] See, e.g., United

---

[4] Because the Court finds reasonable suspicion on the record presented, the Court does not reach the question of whether the various conditions of Pagnani's bail and probation independently allowed for the search and seizure of Pagnani and the Cadillac. See Samson v. California, 547 U.S. 843, 857 (2006) (holding that "the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee" where state law made searches

8

States v. Ickes, 922 F.3d 708, 712 (6th Cir. 2019) (explaining that probationers have "diminished privacy interests" that allow searches of a residence or vehicle based on reasonable suspicion).

### B. The Miranda Warning & Custodial Interrogation

The Court next considers Defendant's Miranda-based objections. "Miranda and its progeny require that law enforcement officers provide warnings concerning certain Fifth Amendment rights—including the right to remain silent and the right to consult an attorney—before interrogating a suspect in a custodial setting." United States v. Carpentino, 948 F.3d 10, 20 (1st Cir. 2020). When a Miranda warning has been provided, "the relevant question is not whether the defendant explicitly waived his Miranda rights but, rather, whether the defendant's conduct, evaluated in light of all the attendant circumstances, evinced a knowing and voluntary waiver." United States v. Simpkins, 978 F.3d 1, 11 (1st Cir. 2020) (citing Carpentino, 948 F.3d at 26). Thus, it is the Government's burden to show that Pagnani (1) "understood both the nature of the right being abandoned and the consequences of the decision to abandon it" and (2) made "a free and deliberate choice" to waive. Id. at 11 (cleaned up).

Defendant initially asserts that she invoked her right to counsel while she was being given her Miranda warning when she said, "Can I call my attorney please and speak with her? I mean not my attorney." The Court disagrees. Considering Pagnani's statement in context, it appears that she was most likely referring to her ongoing desire to speak with her probation officer. Thus, "a reasonable police officer in the circumstances" would not have construed Pagnani's statement to be a request for an attorney. Davis v. United States, 512 U.S. 452, 459 (1994); see also United States v. Dudley, 804 F.3d 506, 513-14 (1st Cir. 2015).

---

"without cause" a condition of parole). The Court notes that the precise terms of Pagnani's probation and bail are not part of the record.

9

Even assuming disagreement with this factual assessment, Pagnani's invocation did not prevent the officer from finishing the Miranda warning already in progress. And, in response to Trooper Duda's final Miranda question, Pagnani responded, "What you got for questions?" With this response, Pagnani, at minimum, made her earlier invocation more ambiguous and equivocal. See United States v. Sweeney, 887 F.3d 529, 536 (1st Cir. 2018) ("'[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning.'") (quoting Davis, 512 U.S. at 459). Alternatively, the Court also finds that Pagnani's response initiated further communications. See United States v. Thongsophaporn, 503 F.3d 51, 55-56 (1st Cir. 2007) ("Where a suspect asserts his right to counsel . . ., further interrogation may not take place 'unless the accused himself initiates further communication, exchanges, or conversations with the police.'") (quoting Edwards v. Arizona, 451 U.S. 477, 485 (1981)). In short, the Court concludes that Pagnani did not invoke her right to counsel in a manner that restricted the officers' ability to interrogate her.

More generally, Defendant argues that the record does not establish that her waiver was knowing and voluntary. Instead, Defendant suggests that a number of promises were made to coerce her into answering questions. Again, the Court disagrees. As the First Circuit has recently explained, "a suggestion that cooperation would lead to favorable treatment" does not "constitute impermissible coercion." Carpentino, 948 F.3d at 28. Rather, a court must determine "the voluntary nature of the statements" by considering "the totality of the circumstances, including . . . the nature of the police activity[,] the defendant's situation, . . . the length and nature of the questioning, promises or threats made by investigators, . . . any deprivation of the suspect's essential needs, [the] defendant's personal circumstances, including [her] age, education,

10

intelligence, and mental condition, . . .as well as [her] prior experience with the criminal justice system." United States v. Jacques, 744 F.3d 804, 809 (1st Cir. 2014) (cleaned up).  In this regard, the Court notes that Pagnani had significant prior experience with the criminal justice system and, as a result, was well versed in her Miranda rights as well as the risks associated with attempting to carry contraband into a jail.  While Pagnani may have earnestly hoped she would be able to say or do something that would prompt the officers to reconsider the decision to arrest her and have her car towed, those hopes were ill-conceived. Having given full consideration to the recorded conversation that took place post-Miranda as well as all of the circumstances preceding the Miranda warning, the Court concludes that Pagnani made a free and deliberate choice when she spoke with Duda and Wilkinson.

Therefore, the Court concludes that Defendant knowingly and voluntarily waived her rights under Miranda, and there is no basis to suppress either her statements or the evidence seized during the May 2019 stop.

### III.    CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress (ECF No. 70) is DENIED.

SO ORDERED.

/s/ George Z. Singal  
United States District Judge

Dated this 1st day of June, 2021.